836 A.2d 707

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STANISLAUS, FAMILY SUPPORT DIVISION
on behalf of Joeann A. JONES

v.

Scott A. RICKETTS.

No. 2677, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 1, 2003.

284

Barbara Strong Goss (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

Argued before HOLLANDER, EYLER and DEBORAH S. GREENE, JJ.

HOLLANDER, J.·

This procedural quagmire is rooted in a 1991 California paternity judgment (the "Paternity Judgment"), obtained by default, and a 1998 California child support judgment (the "Child Support Judgment"), also obtained by default. Both judgments were issued by the Superior Court of California,

County of Stanislaus, Family Support Division O/B/O Joeann Jones, appellant, against Scott Ricketts, appellee.

The 1998 Child Support Judgment required Ricketts to pay monthly child support of $370 plus arrearages of over $10,000 for Scott Ricketts, Jr., who was born to Ms. Jones in California on July 24, 1991.[1] Thereafter, in February 1999, pursuant to the Uniform Interstate Family Support Act ("UIFSA"), Maryland Code (1999 Repl.Vol.), §§ 10–301 et. seq. of the Family Law Article ("F.L."), and the Full Faith and Credit Clause, embodied in Art. IV, § 1 of the United States Constitution, appellant initiated proceedings in the Circuit Court for Carroll County to register and enforce the 1998 Child Support Judgment.

In the court below, Ricketts challenged the registration of the Child Support Judgment.[2] Thereafter, on February 1, 2002, the circuit court vacated the registration of the Child Support Judgment, finding, *inter alia*, that appellee was not afforded an opportunity to be heard in California.

This appeal followed,[3] in which appellant poses one question:

Did the circuit court violate the United States Constitution and federal and Maryland law by refusing to accord full faith and credit to a properly certified California child support judgment when the record contained no evidence to satisfy the contesting party's burden of overcoming the strong presumption that an out-of-state child support judgment is valid and enforceable?

For the reasons stated below, we shall affirm.

---

1. In particular, California sought child support of $370 per month and claimed "the balance of missed payments is $11,840.00 from May 1, 1998 to and including August 31, 1998." The sum in issue constituted arrears that accrued since 1996.

2. Although appellee participated in the proceedings below, he has not submitted a brief or otherwise participated in this appeal.

3. Appellant is represented by the Attorney General of Maryland. In the proceedings below, appellant was represented by an Assistant State's Attorney for Carroll County.

## FACTUAL AND PROCEDURAL SUMMARY

In 1990, appellee lived in Maryland with his girlfriend, Joeann Ortiz, now known as Joeann Jones. In August of that year, the couple moved to California. On November 14, 1990, appellee returned to Maryland. The next day, Ms. Jones told appellee that she was pregnant with his child. On July 24, 1991, Scott Ricketts, Jr. was born to Ms. Jones in California.

On May 6, 1991, during Ms. Jones's pregnancy, the County of Stanislaus, "on behalf of UNBORN CHILD," filed suit against appellee in the California Superior Court, seeking to establish paternity of the unborn child; to obtain reimbursement for public assistance provided to Ms. Jones; and to obtain child support. The complaint alleged, *inter alia*, that "the natural mother, Joeann Alice Ortiz, and the defendant, Scott Al[a]n Ricketts, had sexual relations with each other which resulted in the conception...."

. The paternity suit was served on appellee in Maryland on May 11, 1991. The suit included a document titled "Notice To Defendant," which contained the following information:

> You have *30 CALENDAR DAYS* after this summons is served on you to file a typewritten response at this court. A letter or phone call will not protect you; your typewritten response must be in proper legal form if you want the court to hear your case.

> If you do not file your response on time, you may lose the case, and your wages, money and property may be taken without further warning from the court.

> There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

The Notice also included the address of the Superior Court in Modesto as well as the name, address, and. telephone of Donald N. Stahl, District Attorney, County of Stanislaus.

On May 29, 1991, eighteen days after service of the paternity suit, Ricketts, *pro se,* signed a "Motion to Dismiss For Lack

Of Jurisdiction," contending that he and Ms. Jones "are residents of the State of Maryland and not of the State of California." In addition, Ricketts attached a "Certificate of Mailing" to his motion, indicating that he mailed a copy to Stahl. Further, Jack D. Leonard, II, Esquire, a Maryland lawyer, signed a cover letter, dated May 29, 1991, and sent the Motion to the Clerk of the Superior Court of California "for filing." According to the cover letter, the motion was mailed to the exact address in Modesto that was provided by the Superior Court.

On or about June 10, 1991, the Clerk of the Superior Court apparently returned the motion to dismiss to Ricketts, in care of Leonard. The Clerk included a handwritten note, stating: "Notice must be served on DA; [unreadable] must be signed before a Notary; Motion must be set for hearing or perhaps DA will sign a Stipulation for dismissal." However, there is no evidence in the record contradicting Ricketts's certificate of mailing, in which he said he mailed a copy of his motion to the District Attorney.

In any event, on June 19, 1991, appellee, *pro se*, re-submitted his motion to dismiss. Again, Leonard prepared a cover letter, also dated June 19, 1991, indicating that the motion to dismiss was sent by certified mail to Stahl, the District Attorney.[4] In mailing the motion to Stahl, Leonard followed the Clerk's directions. Appellee heard nothing further, despite the Clerk's earlier indication that a hearing "must" be held.

Appellant concedes in its brief that the first motion to dismiss "was timely [filed] and properly addressed to the

---

**4.** Appellant states in its brief: "[T]he record shows a disparity as to the date the motion was verified and mailed. The notarization claims Mr. Ricketts appeared before the notary on May 29, 1991, and the certificate of service asserts that the motion was mailed that same day. Nevertheless, it appears that the verified version was not created until after June 10, 1991, when the clerk of the court informed Mr. Ricketts' counsel that the facts contained in the motion needed to be verified. In any event, no motion, either verified or unverified, was filed with the court within the time allowed by law, according to the certified default judgment of the California court."

Clerk of the Court, Superior Court of California in Modesto." However, appellant claims "it was not verified as required." With regard to the second motion, appellant concedes that it was "verified," as required, but maintains that it "was not timely" filed.

We pause to observe that, by the time the Clerk contacted appellee on June 10, 1991, thirty days had elapsed from the time that appellee was served with the paternity suit. Therefore, it was impossible for appellee to timely file the revised motion. And, it is significant that the Notice did not advise appellee that, if he filed a motion, it had to be verified. Nor has appellant referred us to any legal authority demonstrating that appellee was, indeed, required to file a verified motion to dismiss.

On September 12, 1991, a Stanislaus County Superior Court judge signed a default "Paternity Default Judgment And Order," purportedly based on appellee's "failure to appear or answer the complaint filed herein, or take any other proceedings within the time allowed by law. . . ." Filed on September 16, 1991, the Paternity Judgment found that "the allegations set forth in the complaint are true and correct," and declared appellee "the natural father" of an "unborn child, due to be born August 8, 1991." Further, it stated, in part:

Default in the above entitled action having been entered . . . and evidence submitted by the plaintiff in their Request and Declaration for Default Judgment, and it appearing to the court that the default of the defendant for failure to appear or answer the complaint filed herein, or take any other proceedings within the time allowed by law has been duly and regularly entered, and the declaration of non-military status having been filed, as provided by law, and evidence. having been introduced in support of the allegations contained in said plaintiff's complaint, and the defendant having been advised of his right to a court appointed attorney if he is indigent, and no request for appointment having been made, the court having duly considered the law and evidence, and it appearing to the court from the evi-

dence that all of the allegations contained in the complaint are true....

The record does not contain any evidence relied upon by the California court "in support of the allegations" regarding paternity. Appellee did not seek to vacate or challenge the Default Judgment under CAL.CIV.PROC.CODE § 473.5 (2003).

In the meantime, on or about May 30, 1991, appellee received a "Voluntary Child Support/Contribution Form" from the South Carolina Department of Social Services. Appellee was asked if he had made any contributions to Ms. Ortiz for the months of February, March, and April 1991, and the inquiry indicated that Ms. Ortiz lived in Conway, South Carolina. In response, Leonard wrote to the Horry County Department of Social Services in Conway on June 11, 1991, stating: "It amazes me how this woman is qualified to receive benefits from you when she has been living in three different states in the past six months and has filed claims in California and with you for support against my client." Appellee never heard anything further from South Carolina.

On December 19, 1997, James Brazelton, then the District Attorney for the County of Stanislaus, filed in the Superior Court of California a "Complaint Regarding Parental Obligations," seeking child support for Scott Ricketts, Jr., in the amount of $3700, dating from January 1996, when "public assistance [was] first paid." According to appellant, Ricketts "was served in Maryland," although the date of service is unclear. A blank Answer form (Form 1299.04) was included with the Complaint.[5] The front of the Complaint stated, in part:

> ... This lawsuit says you are the parent of each child named in this complaint and that you must pay child support. The attached proposed Judgment Regarding Parental Obligations (Form 1299.12) names you as a parent of each child listed below and if there is an amount stated in

---

5. Appellant asserts that the Form is an official State of California form and, "with the concurrence of Mr. Ricketts' counsel, Appellant asks the Court to take judicial notice of the form...."

paragraph 6, orders you to pay support for these children. *If you disagree with the proposed judgment, you must file the attached Answer form with the Court Clerk within 30 days* of the date that you were served with this complaint. If you do not file an Answer, the proposed judgment will become final and payments may be taken from your pay or other property without further notice. See the attached statement of your rights and responsibilities for more information.

(Emphasis added).

Page three of the Complaint is titled "STATEMENT OF RIGHTS AND RESPONSIBILITIES." Among other things, it informed appellee of his right to a hearing, his right to contest paternity, and his right to a paternity blood test. Further, the Complaint stated:

**NOTICE TO THE PARENT ASKED TO PAY SUPPORT (OBLIGOR)**

*The district attorney has sued you to determine whether you are the parent and must pay child support....* Carefully read this statement and other papers which you received.

* * *

*If you dispute paternity* you may ask the Stanislaus County Superior Court Clerk for "Sworn Statement by Defendant Requesting appointment of Counsel, Civil Paternity and Order."

* * *

*You may contact the district attorney to try to work out an agreement. However, you must still file an answer within 30 days....*

* * *

*If you file your Answer, you have the right to a court hearing,* to ask questions of any witness against you, to subpoena witnesses, and to present evidence on your behalf.... *If you deny that you are the parent of the children, you may be scheduled for parentage blood tests.* If you

refuse to submit to the testing the court may determine that you are the parent anyway.

(Emphasis added).

A box outlined on page three of the Complaint contains the following text:

The proposed judgment will be entered against you unless you file a written answer (Form 1299.04) with the court clerk within 30 days of the date you were served with the complaint. The proposed judgment will be entered whether or not you have a lawyer. If you were served with a form telling you the date of a court hearing, you should go to court on that date. An order may be entered without your input if you do not show up for the hearing.

As we observed, the Notice advised that appellee could contact the District Attorney "to try to work out an agreement." Through counsel, that is what appellee attempted to do. On January 8, 1998, Leonard wrote to Brazelton, referencing Case No. 168022, captioned *"County of Stanislaus v. Scott A. Ricketts,"* stating that "his client" did "not admit" paternity and wanted a DNA test. Further, Leonard wrote:

I am in receipt of documents that were forwarded to my client, Scott A. Ricketts, regarding a child that is alleged to be his, namely, Scott Ricketts, Jr., date of birth 07/24/91.

My client does not admit or agree that this child is his and would demand a DNA test to determine the issue of paternity. Please advise me as to the procedure you would follow in order to conduct this test.

\* . \* \*

I would appreciate a response so we can have this matter resolved as soon as possible.

As appellant acknowledges, the District Attorney never responded to Leonard's letter. Shortly thereafter, on January 31, 1998, appellee wrote to Brazelton, stating:

I have received your documents claiming me as the father of the named child born on 7/24/91. I do not admit or agree that this child is mine and demand a DNA test to determine

parentage. Please advise me as to the procedure you would follow to conduct this test. I would appreciate a response so we can have this issue resolved as soon as possible. I would also like to request a waiver of the $182.00 for the court cost due to the financial hardship it would cause me at this time.

According to appellant, no enclosures or other documents were sent with appellee's letter.

The Answer form included a page titled "Information Sheet For Answer To Complaint," labeled "page three of three." It contained a page of instructions, including the following:

Please follow these instructions to complete the *Answer to Complaint or Supplemental Complaint Regarding Parental Obligations* (form 1299.04) if you do not have an attorney to represent you. Your attorney, if you have one, should complete this form.

You must file the completed answer and attachments with the court clerk within 30 days of the date you received the *Summons and Complaint* (form 1299.01).....

INSTRUCTIONS FOR COMPLETING THE ANSWER FORM....

\* \* \*

2. You must request a genetic test to determine if you are the parent if you have checked a "no" box in answer to number 1 above....

\* \* \*

You must date the answer form, print your name and sign the form under a penalty of perjury. When you sign the answer form, you are stating that the information you have provided is true and correct.

(Emphasis added).

It is undisputed that appellee attempted to complete the Answer form enclosed with the Complaint, although he did not request a hearing. Appellee did not include the names of the parties or the case number on the form, which is undated, but he wrote the child's name and date of birth on "page one of

three." Item one of the form, "Parentage," states: "I am the parent of the following children." In response to that item, appellee checked the "No" box. Next to that line, appellee wrote the child's name and added: "I would like proof of parentage of this child before I send additional personal information." Box 4 states: "I disagree with the proposed judgment for the following reasons (specify):" Next to that box, appellee wrote: "I am willing to send more income information if parentage can be proven. I am requesting *no* information on my address, income etc. be given to the child's mother."

Appellee also signed an "Income And Expense Declaration" on January 31, 1998. In it, Ricketts stated that he is an "Electronic Tech" with gross monthly earnings of $1360 and net disposable monthly income of $875.50. Although the record is not clear as to when appellee returned the documents, the record includes a copy of a Return Receipt addressed to the Stanislaus County Court, which indicates that something was delivered to that court by certified mail on February 9, 1998.

On April 30, 1998, appellant filed a First Amended Complaint Regarding Parental Obligations, which merely revised the amount of arrearages. Appellant sought $10,360, dating from 1996, as well as $370 in continuing monthly child support. On page three of the four-page document, the following text is highlighted by insertion in a box: "The proposed judgment will be entered against you unless you file a written answer (Form 1299.04) with the court clerk within 30 days of the date you were served with the complaint."

Ricketts did not file another Answer.[6] However, on June 7, 1998, Ricketts signed an Application for Waiver of Court Fees and Costs. It contained, *inter alia,* his name and address,

---

6. We note that, under Maryland Rule 2–341, appellee would not have been required to file a new answer. The Maryland rule provides that when a "new or additional answer" is not filed in response to an amended pleading, then "the answer previously filed shall be treated as the answer to the amendment."

telephone number, and Case No. 0168022. In addition, appellant completed the financial information form for the waiver. An unspecified item, mailed by appellee to the Stanislaus County court, was received on June 12, 1998. The record does not contain any information as to a ruling on appellee's waiver application.

Thereafter, on September 1, 1998, the California Superior Court, County of Stanislaus, entered a "Judgment Regarding Parental Obligations" against appellee. The record does not reflect that any court proceeding was scheduled or held in regard to the 1998 Child Support Judgment. The 1998 Child Support Judgment ordered appellee to pay $370 a month in child support, beginning May 1, 1998, based on "presumed income," and $10,360 in arrears for "the past periods" of January 1996 through April 1998.

The 1998 Child Support Judgment is a pre-printed form. The first page states: "NOTICE—THIS IS A FINAL JUDG-MENT: It is now legally binding." The form further states: "This Matter Proceeded As Follows:" It also includes various boxes with accompanying text. The box was checked for the line indicating that the judgment was entered "pursuant to Welfare and Institutions Code § 11355." [7] Two other boxes are also checked. The text for one states: "This order is based on presumed income for the obligor . . . ." The text for the other states: "This order is based on the attached documents (specify)." The word "worksheet" is inserted.

As noted, on February 26, 1999, appellant filed in the Circuit Court for Carroll County a Request for Registration of Foreign Support Order, seeking to enforce the 1998 Child Support Judgment. According to appellant, certified copies of the 1998 Child Support Judgment and the 1991 Paternity Judgment were appended to the Request.

---

7. Cal. Welfare & Institutions Code § 11355 has been replaced by California Family Code § 17430 (1999). Former Section 11355 set forth the procedure for entering default judgments in connection with actions for child support under former § 11475.1. *See County of Yuba v. Savedra,* 78 Cal.App.4th 1311, 93 Cal.Rptr.2d 524, 529 (2000).

Appellee was personally served on April 20, 1999. On May 5, 1999, he completed, *pro se,* a pre-printed form titled "Request for Hearing On Registered Order." In it, appellee wrote: "Paternity has not yet been established" and "DNA tests need to be performed."

After several postponements, the master held a hearing on January 12, 2000,[8] at which both parties were represented by counsel. At the outset, counsel for appellant referred to the matter as the "UIFSA Petition to Enforce California Orders." He explained that there were "two operative Orders that we are concerned with...." One was the "Paternity Default Judgment" (Case No. 267113), "signed by the California Court on September 12, 1991...." The other, according to appellant's lawyer, was the "California Child Support Order dated August 27th, 1998," which was filed September 1, 1998, in case 168022.[9]

Appellee's attorney stated that he had initially advised his client to challenge the Paternity and Child Support judgments in California, "based on the failure of the [California] Court to properly pursue that case, and his Motions and pleadings that were filed in the case back in 1991 and in 1998 in California." However, because appellee was unable to raise the necessary funds to contest the matter in California, his lawyer decided to "challenge this case in Carroll County based upon [F.L. §§ ] 10–344, 345, and 346." By agreement with appellant, appellee's attorney asked the court to register the Order and stay its enforcement pending a hearing to contest its validity. Appellee's counsel said: "[W]e intend to ask California to agree to a blood test to challenge this."

---

**8.** The hearing was originally scheduled for August 1999. However, when appellee appeared before the master without an attorney, the case was re-set for December 1, 1999. It was then rescheduled for January 12, 2000.

**9.** Despite appellant's assertion below that there were "two operative orders," appellant contends on appeal that only the foreign child support order is in issue.

Moreover, pursuant F.L. § 10–346, appellee posited "several defenses." He claimed, "first and foremost," that the California court "lacked personal jurisdiction when they entered the Paternity Judgment." He also asserted that "this was possibly done under fraud," because appellee "filed all the appropriate things that he had to file ... and that they just went ahead and did it anyway." Further, claiming that Ms. Jones "admitted she had been seeing other people," appellee claimed that, under the law of Maryland, he was entitled to a blood test to determine paternity. Appellee's counsel added:

What we're believing is that once, and hopefully this case is stayed, or the enforcement is stayed, with a recommendation of blood tests being done, that California will then agree to the blood test.... [W]e cannot make California do anything in this case because they have original exclusive jurisdiction. But it is our hope that they will go along with this, given the problems, especially if Maryland, specifically Carroll County, will refuse to enforce this Order based upon what's being presented to the Court.

The following colloquy is illuminating:

[ASSISTANT STATE'S ATTORNEY]: I'd like to ask if— we can do this better informally—if [appellee's attorney] can tell us at what point Mr. Ricketts ever received a copy of the 1990—September 12th, 1991 Default judgment of Paternity.

[APPELLEE'S COUNSEL]: He would've received that in that time. He's not denying that he ever received any of the paperwork. He—he would state that after receiving it, he went to see Mr. Leonard, and that Mr. Leonard said: Look, we contested this, you know, it should've been done. If you don't hear anything from them, don't worry about it. And....

[MASTER]: He was already in contact with the State of California beginning as early as ... May [of 1991].

\* \* \*

[MASTER]: So when the Default is issued by California in September of '91, the only thing that—that Default covers

is that Hundred and Fifty Dollars for fees, but child support, at that point, is stayed?

[ASSISTANT STATE'S ATTORNEY]: Right.

[APPELLEE'S COUNSEL]: Reserved.

[ASSISTANT STATE'S ATTORNEY]: It covers the Paternity itself.

\* \* \*

[MASTER]: So it's a Default on Paternity . . . .

[ASSISTANT STATE'S ATTORNEY]: Right.

\* \* \*

[ASSISTANT STATE'S ATTORNEY]: [S]omething official should've been done [by appellee] rather than let it just go.

[APPELLEE'S COUNSEL]: I can't argue that point. And—but, fortunately, under Maryland, we have the new *Tyrone* case that will allow us to challenge that no matter the fact that he did or didn't do anything, or should have or shouldn't have done anything back in 1991.

\* \* \*

[MASTER]: And the question that I have, that's still hanging out there, and I presume that well ... have some information from California about this is, if they held—if they reserved on the child support issue, at that point, how can we back up arrears?

[ASSISTANT STATE'S ATTORNEY]: I don't—I don't—I don't know.

[MASTER]: Their—their Order—their most recent Order backs arrearage to '96.

[ASSISTANT STATE'S ATTORNEY]: To '96 and the pleading was not done until '97.

[MASTER]: Right.

[APPELLEE'S COUNSEL]: That's correct.

[MASTER]: December of '97.

[APPELLEE'S COUNSEL]: And—and that's the second— I mean, I'm trying to get past the first hurdle first.

[MASTER]: Yeah.

[APPELLEE'S COUNSEL]: And—and we were asked about that, in there, if we were contesting the amount. I said, you know, I haven't gotten to contesting the amount. Mr. Holcombe ran the Guidelines based on the income he submitted to California back in 1997 and instead of Three Seventy, under our Statute it would've been, like, Two Fifty-three, assuming that she was on—on support. . . .

[MASTER]: Some kind of assistance.

[APPELLEE'S COUNSEL]: Some sort of assistance and he just based it upon his number. That is a whole other issue that, to be honest, I'm not prepared to argue or fight over today because I think, if we can get Paternity established, or not established, then all that falls by the wayside.

[ASSISTANT STATE'S ATTORNEY]: I agree. But, Your Honor, just so I'm on the record, in response to the Court's question. I think if we do get to the stage at some point of Paternity having been resolved and that Mr. Ricketts is the father, I think we're—we have to enforce their Order, and I don't know what their Statute calls for.

[MASTER]: Right.

[ASSISTANT STATE'S ATTORNEY]: Our Statute only addresses retroactivity from the filing date. California's may be different.

[APPELLEE'S COUNSEL]: And that's something I have not explored. . . .

[MASTER]: Right. Okay. So whatever—so then your argument would be that the arrearage, at that time would be based on whatever California. . . .

[ASSISTANT STATE'S ATTORNEY]: Yes.

[MASTER]: Because California is the controlling Order?

[ASSISTANT STATE'S ATTORNEY]: Again, assuming, the validity of their Orders.

Appellant's counsel argued:

I have a slight problem, as I told [appellee's counsel] in the hall, not with the language of continuing the proceeding, that's no problem, but to permit production of additional

relevant evidence. [Appellee's counsel], from our discussion in the hall, seems to want to get this Court involved in a blood test, and I don't believe that we're in a position, at all, to rule on Paternity now, or . . . in the future.

I think the most that this Court can choose ultimately to do to Mr. Ricketts best hope [sic] is to say that we are not going to enforce that Order because it doesn't meet the standards in [F.L. § ]10–346.

I—I think that this Court is in a position where it can't, obviously, to me, order blood tests, but I think this Court can pass an Order recommending that the California Court order blood tests or DNA tests.

* * *

But I don't want us to be in a position—or this Court to be in a position of saying that Mr. Ricketts is not the father. I don't think we can do that. I think the most this Court can do is say we're not going to enforce that Order. Whether Mr. Ricketts is the father or not the father is not within the bailiwick of this Court at this time.

Thereafter, in late January 2000, appellee filed a "Motion To Contest The Validity And Enforcement Of Registered Order and Motion to Vacate Registration," pursuant to F.L. § 10–344 and 10–346. Numerous exhibits were appended to the motion.[10]

In the master's report and recommendation, dated April 18, 2000, she noted that appellee's counsel had "proffered" the chronology of events beginning with appellee's return to Maryland in November 1999. The master found: "At all times [appellee] has questioned personal jurisdiction, contested the paternity of the minor child, and asked for DNA testing. . . . Your Master finds that [appellee] '. . . exercised ordinary care to act diligently . . . in moving to set aside the paternity judgment.' *Tyrone W.* [*v. Danielle R.*, 129 Md.App. 260,] 299, 741 A.2d 553 [(1999)]. Therefore, there was no waiver of his

---

**10.** We have already referred to many of these documents; it does not appear that any of them are in dispute.

right to seek and obtain blood or genetic testing." Further, relying on F.L. § 5–1029, the master found it "appropriate to order genetic testing" for the parties, in order to "determine if the Court may exercise its revisory power" under F.L. § 5–1038(a)(2)(I)(2).

On May 17, 2000, the circuit court entered an Order registering in Maryland the 1998 California "Judgment Regarding Parental Obligations." At the same time, pursuant to F.L. § 10–346(b), the court ordered a stay of enforcement of the Registered Order. In addition, pursuant to F.L. § 5–1029, the court ordered both parents and the child to submit to genetic testing, to be arranged by the Carroll County State's Attorney's Office. The court also ordered a hearing on the motion to vacate upon receipt of the genetic testing results. Almost a year later, on May 14, 2001, appellant asked the court to schedule a hearing in regard to the Order of May 17, 2000. Among other things, the attorney said: "That the initiating tribunal [i.e., California] refuses to cooperate with genetic testing."

The master held a hearing on August 8, 2001, in regard to appellee's motion to vacate. Appellee's counsel represented to the court that appellee had submitted to the blood test, but that Ms. Jones and the child had refused to do so. In addition, appellee's counsel reiterated the defenses previously presented at the hearing in January 2000. Recounting appellee's efforts from the outset to challenge paternity, appellee's lawyer said:

It's our position that when this original pleading came to my client from California, he did everything in his power at that time to contest, oppose, and attempt to obtain proof of paternity. He was served here in Maryland. We believe that he did not have—they did not have personal jurisdiction to put forth the Order. As the Court knows, the paternity—the petition was filed before the child was even born, that was about May 6th, 1991, and it's attached as Exhibit One in the Memorandum. On May 11th the Defendant was served—on May—of 1991. On May 29th, 1991, the Defendant, pro se, at that time, filed a Motion to

Dismiss the Complaint, which is filed as Exhibit Two of the Memorandum. He was represented, locally at that time, by Jack Leonard. And Mr. Leonard received a note from the Court indicating some filing instructions on or about June 4th which is Exhibit Three of the Memorandum. The Defendant then re-filed his Motion to Dismiss on June 19th, 1991, and that's Exhibit Four. Without the benefit of a hearing or—or anything, a ruling on the Motion to Dismiss did not occur, and the Court entered a Default Order on July 19th, declaring the Defendant the father of the minor child, who still had not been born. On May 30th, 1991, the Defendant received information indicating that Miss Jones had filed for support in the ... State of South Carolina. So, at the same time, she was having two cases going on in two different states against my client, and that was Exhibit Five. My client responded to that on about June 11th, 1991, and Mr. Leonard did that on his behalf, that's Exhibit Six. We allege that there was fraud in obtaining the jurisdiction on my client in—in pursuing the matter in California, and then turning around and then also pursuing the matter in South Carolina at the same time. My client heard nothing for the next six years, when in December of 1997, a Complaint was filed for Child Support in California, Stanislaus County, again, and that's Exhibit Seven, and they were asking for back support to 1996. The Complaint gave my client instructions on how to contest paternity. Therefore, California, at that point in time, in my opinion, Your Honor, and what we would proffer and argue, is that, when they give him a second chance, or give him a new chance to contest paternity, everything prior to that is null and void, or should be null and void. On January 8th of 1998, Mr. Leonard sent a letter contesting the paternity, and demanding a DNA test. And, on January 31st of 1998, the Defendant filed a response demanding the paternity test and denying paternity—the—and that's Exhibit Nine. Subsequently, the District Attorney for Stanislaus County amended the Complaint ... but all they did was add arrears back to 1996, and that's Exhibit Ten. On June 7th of 1998, the

Defendant filed for a Waiver of Costs, and then without a hearing, a final Judgment was entered on September 1st, 1998, again, without the benefit of a hearing, or any blood test, paternity test, even though California had given him that opportunity. Again, I argue, Your Honor, that the State of California lacked personal jurisdiction to enroll that Order at that time because he had contested and did not have—was not given the opportunity for a hearing.

Appellee's lawyer continued:

I further raise, Your Honor, that Maryland law provides my client the opportunity to raise any defenses that he would have as the father of the minor child, or the alleged father of the minor child. Under Family Law 5–1038, he's entitled to a blood test and the case of Tyrone W. versus Danielle R. .... That case, and all the progeny of that case, clearly indicates that my client's entitled to a blood test at any time that he requests it basically. Especially in a situation where we have been able to provide, to this Court and was also provided to the California Court, the desire to have the blood test, at that time, or DNA testing. He has maintained that he is not the father since 1991, and California has had evidence of that before them, and has elected to ignore my client's defense of non-paternity. Your Honor, based upon this, we believe that we are clearly entitled to have the registration vacated. They have ignored the personal jurisdiction—or have ignored the claims of my client that he's not the father. They have failed, now, to abide by Maryland's ... order to get the blood test which we've offered to pay for, which we furthermore offered to drop this matter if, in fact, the child ends up being his, and to work out a payment on all the arrears. And it's our position, Your Honor, that the Court cannot and should not enforce California's Order for child support.... Therefore, Your Honor, we'd ask that the registration be vacated.

Counsel for appellant responded that "the paternity issue has nothing to do with the UIFSA proceeding" pending before the court, and the paternity decree is "completely irrelevant" to the UIFSA proceeding. He added: "Your Honor, let's not

lose sight of the fact that this is a UIFSA proceeding .... the paternity issue is completely separate and distinct from the UIFSA proceeding." In the view of appellant's counsel, both the California paternity decree, and the California child support order are valid, because "nothing that [appellee] claims that he filed with the [California] Court was actually filed with the Court." Because appellee "never filed anything with the Court," appellant insisted that "Maryland is obliged to abide by" the child support order, and give it full faith and credit.

Further, appellant's attorney claimed that, despite the language in the Complaint for child support pertaining to the right to challenge paternity, it was not applicable, given the age of the paternity decree. He also explained that "the California court doesn't have to have Miss Jones submit to blood testing in California," in light of "the valid paternity decree." Moreover, appellant maintained that if appellee wants to pursue his challenge to the paternity decree "he needs to do it in California."

The following colloquy is illuminating:

[MASTER]: How do you get around [appellee's] Exhibit number Nine when, yes, Mr. Ricketts sends this letter addressed to Mr. Brazelton [the District Attorney in California], but clearly fills out the form that says, Answer to Complaint of Supplemental Complaint [sic] Regarding Parental Obligation? It's dated, he fills it out, he still, at that point, wants proof of parentage which he was never afforded the opportunity to have, never given his due process in California for. How do we get around that? ... [H]ow do we get around that when, um, we afford every opportunity, um, for due process when it comes to something so serious as the parent of a child who may not be the parent of the child?

[APPELLANT'S ATTORNEY]: Well, let me just start by saying that the letter addressed to Mr. Brazelton, as unfair as it may—may seem, they have no affirmative duty to go file that with the court.

[MASTER]: So it's your—it's your contention, it went—even this form went to Mr. Brazelton?

[APPELLANT'S ATTORNEY]: Went to Mr. Brazelton.

[MASTER]: Okay.

[APPELLANT'S ATTORNEY]: And as far as the due process rights of Mr.—Mr. Ricketts, the paternity decree was some seven years earlier. In this . . .

[MASTER]: When he challenged it seven years earlier.

[APPELLANT'S ATTORNEY]: Right. But, again, it is, um, the opinion of Stanislaus County that that was never—none of those documents were ever filed with the court.

[MASTER]: He files a Motion to Dismiss for lack of Personal Jurisdiction with the Clerk of the Circuit Court on May 29th, 1991, and that's not sufficient for them?

[APPELLANT'S ATTORNEY]: If you look at the documents that [appellee] has provided, the Clerk of the Court sent something back to [appellee] saying you didn't do it right, you didn't follow our rules of procedure, and after that he refiled it. When they said that they—that he didn't follow their rules of procedure, they listed specific things that he had failed to do. They said that it wasn't under affidavit, they said that it wasn't served on the D.A., um, he re-files, with it being under affidavit, and sends it directly to the District Attorney.

[MASTER]: Because on the notice it says, what I have written on here, notice was to be signed, served on the D.A., which I can't read, declaration, I guess, must be signed before a notary, motion must be set for hearing or perhaps D.A. will sign a stipulation for dismissal. So we—we have a pro se person, yes, he has benefit [sic] of someone here telling him what to send, but he sends it to the D.A., because that's what he's told, has to be served on the D.A., sends the exact same motion, and it says, motion must be set for hearing or perhaps the D.A. will sign a stipulation, and they—they don't think that's misleading then? And they're not willing, then, at all, to accept that as his contest

of the original finding of paternity when this child hadn't even been born yet?

[APPELLANT'S ATTORNEY]: Well, there are two things I'd like to address about that. One, ... I still maintain that the paternity decree cannot be challenged through this UIFSA process. If he wants to challenge the paternity decree it needs to be done in California. The other thing I would like to add about that is Section 10-346 of the Family Law Article which lists ... the different issues that a Defendant can raise in challenging the registration of an order.

As to the issue of fraud, the following exchange is relevant:

[APPELLANT'S ATTORNEY]: [Appellee] has basically raised two issues: lack of personal jurisdiction and fraud. I fail to see how a—what essentially amounts to a procedural screw up amounts to fraud.

[MASTER]: It's fraud because [Ms. Jones] also went to [the] South Carolina Department of Social Services and filed for child support there ... when she had already pursued it in California at the same time. Both places she's asking for it, and at the time, if you carefully read, at that time, they were both living in the State of Maryland, [appellee] testified to that. They were both living in the State of Maryland....

[APPELLANT'S ATTORNEY]: Well I would submit to Your Honor that, uh, even if the process in South Carolina is fraudulent, it does not make the procedure in California fraudulent.

[MASTER]: It does if she represented to the State of California she was living there and she wasn't living there, and she was living in the State of Maryland at the time that she filed. We already know she filed in South Carolina when she was living in the State of Maryland. There's no— there's no indication that she was ... living in the State of California when she filed the original petition when he— when the child was unborn.

[APPELLANT'S ATTORNEY]: Well, again, I would submit to Your Honor that the Statute clearly makes the burden of proving fraud on the [appellee]. If he is alleging fraud, then he would need to prove that Ms. Jones wasn't living in California at the time she filed for child support services or filed for the ... paternity decree, and I haven't heard anything today about that.... You had asked me a question about Tyrone W. and the rights that we afford putative fathers in this State ... I want to reiterate that that is completely irrelevant in this proceeding ... California is not Maryland, and they have their own laws and rules about establishing paternity. They have, what is in their minds, a valid paternity decree, and that cannot be challenged in a UIFSA process.

Appellee responded: "[T]hey haven't presented anything but hearsay." Moreover, appellee's attorney pointed out that no affidavits, docket sheets, or other evidence was offered to show what was filed with the California court. Appellant's attorney countered: "[Appellee's counsel] seeks to shift the burden on me. I don't have to prove anything. He is the one that has the burden. The statute clearly says that."

The master said:

[M]y concern from the beginning of this was, first of all, there is no equity in the way that Mr. Ricketts was treated by the State of California. But setting that aside for the minute, it's now a UIFSA case, they're asking me to enforce an Order that was—um—was obtained in California. There are certain defenses under the UIFSA statute in the State of Maryland that are allowed to be raised when registration or enforcement is requested, and one of those is [this:] is there ... a defense under the law of this State to the remedy sought. There is a defense to Mr. Ricketts in the State of Maryland. He is permitted ... to challenge paternity and challenge the fact that there was not personal jurisdiction over him from the get-go. He has ... challenged it from the beginning, *it's clear that he challenged it from the beginning in all the documents that have been submitted to this Court,* and ... there's some question

about who he sent it back to, but ... when I see the notes [from the California court] that I'm looking at, it appears to me that, if you're looking at someone who is pro se and they're following instructions given by someone, *he did what he was told to do.* He served it on the D.A., it had to [be] signed before a notary, and ... then it says, motion must be set for hearing or perhaps the D.A. will sign a stipulation for dismissal.... *[T]hat leaves the door open to the [view that the] contact person was the District Attorney, they got the information, ... they went forward knowing fully that he contested their personal jurisdiction.* Then we have the whole other indication from South Carolina. What I find interesting is that South Carolina received a letter advising them of the situation regarding the Plaintiff, Joeann Jones, she was Joeann Ortiz at that time, and we have no further comment from South Carolina. No ... further orders, no further anything. It's pretty evident to me that she, then, was moving around.... [A]nd there's never been anything ... presented to indicate that she wasn't, at one point, living in the State of Maryland. And we have, after Mr. Ricketts sends the response back to Mr. Brazelton in January of 1998, with all the information requested, indicating he will send more information once the paternity has been challenged, he gets a new complaint, again, indicating monthly payments that he had no part in—in developing. He has—he's been in contact with the State of California and ... *the District Attorney's Office there the entire time, and still no one, no one, contacts him other than by sending him petitions, and then we have a Default Order with, once again, with him raising the issue of, I want a paternity test.* And in the State of Maryland he can ask for a paternity test under both the cases. It's a—it's a defense he has in this State and not to mention that equity would afford him that opportunity. It is—*it is inequitable that he would have been determined to be a father of a child in 1991, when he originally challenged it, before the child was even born, and we would wait six years to, then, come forward, again, to try to pursue him for this judgment.*

*And the only reason that California has an order, at this point, is after—even after full knowledge of everyone that he was challenging this, each and every time, an order was entered by default.*

(Emphasis added).

The master concluded:

[B]ased on the UIFSA statute in the State of Maryland, under Section 10–346, I'll vacate the registration because he has a defense that is afforded him under the State of Maryland, and I offered that opportunity to the State of California, and they refused to comply with this Court's Order which would have at least brought the parties to an equal balance. So I'll vacate the registration.

Thereafter, on August 8, 2001, the master issued the "Report and Recommendations of Master," in which she recounted the chronology of events. Among other things, the master specifically found that appellee "followed the instructions given to him" in the note of June 4, 1991, sent by the Stanislaus County Court. Moreover, the master found that appellee repeatedly sought to contest the paternity and child support proceedings in California and requested DNA testing. Nevertheless, "without the benefit of a hearing on any of the objections [appellee] had previously raised," the California court entered a judgment against appellee on September 1, 1998, for child support. Therefore, pursuant to F.L. § 10–346(a)(1) and (5), the master concluded that appellee

has appropriately raised the following defenses available to him: "... (1) the issuing tribunal lacked personal jurisdiction over the contesting party ..." and "... (5) there is a defense under the law of this State to the remedy sought." 8. Your Master finds that at all times, the defendant has questioned personal jurisdiction, contested the paternity of the minor child, and asked for DNA testing.... [A]nd Your Master finds that the Defendant, "... exercised ordinary care to act diligently ... in moving to set aside the paternity judgment." ... Therefore, there was no waiver of his right to seek and obtain blood or genetic testing.

**313**

Accordingly, the master recommended that the court grant the motion to vacate the registration.

Appellant filed exceptions on August 15, 2001, claiming that the master's recommendation was "contrary to both the law and the evidence." Again, appellant argued that paternity could not be challenged in a UIFSA registration proceeding, and that appellee failed to establish any of the defenses under F.L. § 10–346. Appellee timely responded.

The circuit court held a hearing on the exceptions on October 3, 2001. At the hearing, counsel for appellant reiterated that "the burden of proving any of these [defenses] . . . [is] on the party seeking to vacate the registration." Further, appellant asserted:

> Now, when the parties were before [the master], [appellee] makes a bald allegation that California had no personal jurisdiction over him and . . . provided no evidence to support that allegation. The same is true of the allegation that the Order was obtained by fraud. Again [appellee] has the burden of proving these items . . . there was no evidence presented to [the] Master on which to base that decision.
>
> The Master in her Report and Recommendation does, however, state that based on the case of *Tyrone W.* . . . a father has the right to ask for genetic testing at any time. And, I really don't disagree that that's what that case says. What I disagree, however, with is that I don't believe that that is a defense [to a UIFSA proceeding] under the laws of this [S]tate as contemplated by [F.L.] Section 10–346(a)(5).
>
> Now, the reason I say that is because I believe that Maryland has a Constitutional duty to give full faith and credit to the California paternity adjudication. If [appellee] has a problem with the paternity finding, if he feels that somehow his due process rights were violated, in that Default Order—that the Order of Paternity was by default, then I believe he needs to challenge that in California.
>
> If the Master is correct, that a person can raise paternity in a [UIFSA] registration proceeding, then, it makes com-

pletely meaningless a paternity finding of any other jurisdiction that happens to not do D.N.A. testing, and it places the Bureau of Support Enforcement in this State in the precarious position of having to coordinate D.N.A. testing between Maryland and a foreign jurisdiction.

Appellee responded:

The one thing he failed to address, and this is very important in terms of the personal jurisdiction and the fraudulent aspect of the defenses, is that in May of 1991, Mr. Ricketts received correspondence from the State of South Carolina attempting to pursue paternity and a judgment against him, which was prior to the involvement of the State of California, which, at that point, then, would eliminate the jurisdiction—or potentially limit the jurisdiction of the State of California that they would have over, not only Mr. Ricketts, but also their own client, Ms. Joanne Jones....

\* \* \*

You also have the issues that he contested all along. *He did everything the State of California ... asked him to do with regard to contesting the Paternity and the Child Support Orders that were eventually entered by default.*

Interestingly, the 1996—or the *1998 Petition gave him the opportunity to raise paternity again. They actually told him how to do it. He did it and they ignored him again and entered a Default Order.*

Therefore, our arguments as to jurisdiction and fraud—they're—they're kind of together. It's almost a symbiotic relationship in that we have South Carolina coming after him, then we have California coming after him and saying, "We don't care what you do, we're going to enter a default anyway." *He did everything he was supposed to do.*

That, eventually, leads us to the defenses in Maryland under 346 Section 5, which Maryland has now allowed fathers to contest paternity. That is a defense to child support and paternity in the State of Maryland. The statute is clear, it says, "any defenses in the State of Maryland to the remedy sought." And, that's one of them.

Now, California has made themself available of the Maryland statute by pursuing it this way; therefore, they're also subject to Maryland's defenses that can be raised. And, . . . one of those that we can raise is the defense of paternity. We've raised it, Mr. Ricketts has submitted to the paternity test because there was a previous Order to do it. California has refused to go along with Maryland's Order, which I believe you signed. Your Honor, saying, "Do the D.N.A. testing." We—we appeared, we did it, they've refused. We've done everything, Your Honor, that we can to contest this paternity and go forward. . . .

(Emphasis added).

In its Memorandum Opinion and Order dated January 24, 2002, the circuit court observed:

Defendant has maintained since 1991 that he is not the father of the minor child in question. The basis for Defendant's belief that he may not be the father of the child is that while the parties were dating Ms. Jones told him that she was seeing other men and had been sleeping with them. Defendant alleges that he and Ms. Jones reconciled and moved to California. Defendant further alleges that while in California he suspected Ms. Jones was seeing someone else and confronted her. Soon after that confrontation he returned to Maryland. He was later notified by Ms. Jones that she was pregnant.

The court concluded that the evidence presented to the master established that California did not have personal jurisdiction and that the California paternity order was obtained by fraud. It reasoned:

Defendant alleges that the issuing tribunal, the Superior Court of California, County of Stanislaus, Family Support Division, did not have personal jurisdiction over [appellee] and that the Order was obtained by fraud. Specifically, [appellee] alleges that he is not the father of the minor child and that under Maryland law he is entitled to a blood test to determine paternity. . . .

The Full Faith and Credit Clause requires that each state accord a judgment of another state as much respect and credit as it would receive in the rendering state. However, a court need not grant full faith and credit to a judgment that was procured by fraud, i.e., a fraud that deprived [appellee] of his opportunity to appear and defend. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 106 (1969).

The State argues that the paternity issue is separate and distinct from the UIFSSA proceeding and that [appellee's] allegations regarding fraud are irrelevant in this proceeding. However, *the evidence indicates that [appellee] repeatedly attempted to contest this matter and was ignored.* (Emphasis added).

Accordingly, the court found that, upon review of the transcript of August 8, 2001, "the defenses asserted by [appellee] were established by the evidence heard by the Master." Relying, *inter alia*, on F.L. § 10–346 and *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000), the circuit court denied appellant's Exceptions and granted appellee's Motion to Vacate. This appeal followed.[11]

We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

Appellant contends that the circuit court violated the Full Faith and Credit Clause of the United States Constitution, the Full Faith and Credit for Child Support Orders Act ("FFCCSOA"), and the Uniform Interstate Family Support Act ("UIFSA"), because "it vacated the registration of a properly certified California child support order and underly-

---

11. On November 27, 2002, this Court issued an Order remanding the case to the circuit court, directing it to comply with Md. Rule 2–601 by entering a judgment in conformance with that rule. Thereafter, the circuit court issued a separate "Judgment," dated December 23, 2002.

ing paternity judgment without requiring appellee, Scott Ricketts, to present any evidence to sustain his burden of proving the order [and judgment] invalid." Appellant asserts that UIFSA "required the circuit court to accord the California judgment a presumption of validity," and that FFCCSOA required the circuit court to enforce the California order according to its terms, so long as "California had subject matter and personal jurisdiction and provided the contestants reasonable notice and an opportunity to be heard." According to appellant, because "parentage is not a defense under UIFSA," the circuit court "erred by relying on [appellee's] unconfirmed belief that he might not be the father." Moreover, appellant maintains that appellee had the burden of proving any defenses, and was thus obligated to present affirmative evidence that California "lacked personal jurisdiction, or that the judgment was obtained by fraud that denied him an opportunity to be heard."

We begin with a review of the two statutes that are at the center of this case. One is a federal law known as the Full Faith and Credit for Child Support Orders Act ("FFCCSOA"), 28 U.S.C. § 1738B (1994 & Supp.1998). The other is known as the Uniform Interstate Family Support Act or "UIFSA," which is codified in Maryland in the Family Law Article of the Maryland Code, at F.L. §§ 10–301 to 10–359.

FFCCSOA was first enacted by Congress in 1994. It seeks to ensure that child support orders receive full faith and credit in sister states. *See State ex rel. George v. Bray,* 130 N.C.App. 552, 503 S.E.2d 686, 689 (1998); *see also* 28 U.S.C. § 1738B. Moreover, the provisions of the FFCCSOA are "binding on all states and supersede any inconsistent provisions of state law." *Kelly v. Otte,* 123 N.C.App. 585, 474 S.E.2d 131, 134 (1996), *review denied,* 345 N.C. 180, 479 S.E.2d 204 (N.C.1996); *see Wilkie v. Silva,* 141 N.H. 461, 685 A.2d 1239, 1241 (1996)(same); *State v. Fleet,* 679 So.2d 326, 329 (Fla.Ct.App.1996); *Bobbs v. Cline,* 116 Ohio App.3d 46, 686 N.E.2d 556, 559 (1997). Thus, any inconsistencies between FFCCSOA and state law "must be resolved in favor of

FFCCSOA." *Tepper v. Hoch,* 140 N.C.App. 354, 536 S.E.2d 654, 659 (2000). *Accord Bednarsh v. Bednarsh,* 282 N.J.Super. 482, 660 A.2d 575 (1995).

■ As one court has explained, FFCCSOA "is similar to UIFSA both in terms of structure and intent. FFCCSOA similarly obligates states to enforce, according to its terms, a child support order issued by another state which is made consistent with the Act's jurisdiction and due process standards." *Gentzel v. Williams,* 25 Kan.App.2d 552, 965 P.2d 855, 860 (1998).

■ UIFSA works together with FFCCSOA "to facilitate the enforcement of child support orders among the states." *Harbison v. Johnston,* 130 N.M. 595, 28 P.3d 1136, 1143 (2001).[12] *See Bray,* 503 S.E.2d at 689 ("UIFSA is state law

---

12. UIFSA replaced the Uniform Reciprocal Enforcement of Support Act ("URESA"). *See* Family Support Act of 1988, Pub.L. No. 100–485 § 126, 102 Stat. 2343, 2355 (1988)(codified at 42 U.S.C. § 666). In *Gentzel v. Williams, supra,* 25 Kan.App.2d 552, 965 P.2d 855, the Kansas court considered whether Kansas had jurisdiction to modify and reduce an Arizona child support order under UIFSA or FFCCSOA. In its discussion, the court elucidated the differences between UIFSA and URESA, noting that UIFSA was intended to "further national uniformity regarding the enforcement of child support orders...." *Id.* at 858. The court further stated:

Both URESA and UIFSA were promulgated and intended to be used as procedural mechanisms for the establishment, modification, and enforcement of child and spousal support obligations.

\* \* \*

"How does the new Act differ from URESA? ... Probably the most significant improvement offered by UIFSA is the elimination of the multiple-order system existing under URESA. Orders entered under URESA have been defined as additional to, and not replacements of, prior support orders. Thus at any particular time, two or more orders covering the same child might exist with different levels of support set by each one. When combined with the general family law rule permitting modification of existing child support orders on the basis of changed circumstances, the resultant chaos and confusion is certainly understandable.

By contrast, UIFSA adopts the concept of continuing, exclusive jurisdiction to establish and modify the levels of child support due a particular child. Thus, once a court or administrative agency enters a support decree with jurisdiction, it is the only body entitled to modify if so long as it retains continuing, exclusive jurisdiction under

designed to facilitate the collection of child support in interstate cases."). *See also* Patricia W. Hatamyar, *Interstate Establishment, Enforcement, and Modification of Child Support Orders*, 25 Okla. City U.L.Rev. 511, 541–43 (2000) ("Hatamyar"). It was intended to address the problem of multiple support orders issued by multiple states as to the same child. *See* Patricia W. Hatamyar, *Critical Applications and Proposals for Improvement of the Uniform Interstate Family Support Act and the Full Faith and Credit for Child Support Orders Act*, 71 St. John's L.Rev. 1 (1997); Levy and Hynes, *Highlights of the Uniform Interstate Family Support Act*, 83 Ill. B.J. 647 (1995). Congress required all states to adopt UIFSA in its entirety by January 1, 1998, to remain eligible for federal funding for child support services. 42 U.S.C. § 666(f)(1996 Supp.). Therefore, UIFSA has been adopted by every state and the District of Columbia. *See* Hatamyar, 25 Okla. City U.L.Rev. at 516.

 UIFSA provides procedural and jurisdictional rules for interstate child support proceedings, including the enforcement of foreign child support orders. Among other things, UIFSA "implements the 'one-order system.' This means that only one state's order governs, at any given time.... This necessarily requires all other states to recognize that order and to refrain from modifying it unless the first state has lost jurisdiction." *Hatamyar*, 25 Okla. City U.L.Rev. at 515–516. "Under this proposition, only one state controls the support obligation, and once that state obtains jurisdiction, it then has continuing exclusive jurisdiction over the parties." *United States of America v. Kramer*, 225 F.3d 847, 855 (7th Cir.2000)(citing *Supporting Our Children: A Blueprint for Reform, U.S. Commission on Interstate Child Support's Report to Congress* 232 (1992)).

---

the Act. Another state, while required by UIFSA to enforce the existing decree, has no power under that Act to modify the original decree or enter a support order at a different level."
*Id.* at 858–59 (quoting Sampson and Kurtz, *UIFSA: An Interstate Support Act for the 21st Century*, 27 Fam. Law Qtrly. 85, 88 (1993)).

Under UIFSA, "A support order . . . issued by a tribunal of another state may be registered in this State for enforcement." F.L. § 10–340. "A registered order issued in another state is enforceable in the same manner and is subject to the same procedures as an order issued by a tribunal of this State." F.L. § 10–342(b). *See also, e.g., Goens v. Rose,* 778 N.E.2d 861, 867 (Ind.Ct.App.2002)("Pursuant to the UIFSA, an Indiana trial court 'may exercise personal jurisdiction over a nonresident individual' in a proceeding 'to establish, enforce, or modify a support order or to determine paternity' . . ."); *Department of Human Services v. Shelnut,* 772 So.2d 1041, 1044 (Miss.2000)("The UIFSA, as enacted in Mississippi, provides a procedure whereby child support orders from foreign states and countries may be enforced in this [state]."); *Department of Social Services v. Bess,* 327 S.C. 523, 489 S.E.2d 671, 673 (1997)("UIFSA provides a mechanism to facilitate the interstate collection of child support.").

"For the most part [UIFSA and FFCCSOA] are complementary or duplicative and not contradictory." *Bray,* 503 S.E.2d. at 689. Thus, "FFCCSOA . . . is intended to work in tandem with the UIFSA and essentially mirrors its jurisdictional concepts." *Harbison,* 28 P.3d at 1142. As the Kansas court explained in *Gentzel v. Williams, supra,* 965 P.2d at 860, "FFCCSOA is similar to UIFSA both in terms of structure and intent. FFCCSOA similarly obligates states to enforce, according to its terms, a child support order issued by another state which is made consistent with the Act's jurisdiction and due process standards."

■■■■ FFCCSOA provides that, "[i]f only [one] court has issued a child support order, the order of that court must be recognized." 28 U.S.C. § 1738B(f)(1). Thus, when one state issues a child support order, all other states "shall enforce" that order "according to its terms," so long as the rendering court had "subject matter jurisdiction to hear the matter and enter such an order"; "personal jurisdiction over the contestants"; and the contestants were provided "reasonable notice and opportunity to be heard." 28 U.S.C. § 1738B(a)(1) and 28

U.S.C. § 1738B(c). Moreover, "[m]odification under FFCCSOA of a valid order is only allowed if: (1) neither the child(ren) nor any of the parties remain in the issuing state and the forum state has jurisdiction over the parties; or (2) all parties have consented to the jurisdiction of the forum state to modify the order." *Gentzel,* 965 P.2d at 860; *see* 28 U.S.C. § 1738B(e) and (i).

Section 1738B of FFCCSOA states, in pertinent part:

**(a) General rule.**—The appropriate authorities of each State—

(1) shall enforce according to its terms a child support order made consistently with this section by a court of another State; and

(2) shall not seek or make a modification of such an order except in accordance with subsections (e), (f), (i).

\* \* \*

**(c) Requirements of child support orders.** A child support order made by a court of a State is made consistently with this section if—

(1) a court that makes the order, pursuant to the laws of the State in which the court is located and subsections (e), (f), and (g)—

(A) has subject matter jurisdiction to hear the matter and enter such an order; and

(B) has personal jurisdiction over the contestants; and

(2) *reasonable notice and opportunity to be heard is given to the contestants.*

**(d) Continuing jurisdiction.**—A court of a State that has made a child support order consistently with this section has continuing, exclusive jurisdiction over the order if the State is the child's State or the residence of any individual contestant unless the court of another State, acting in accordance with subsections (e) and (f), has made a modification of the order.

**(e) Authority to modify orders.**—A court of a State may modify a child support order issued by a court of another State if—

(1) the court has jurisdiction to make such a child support order pursuant to subsection (i); and

(2) (A) the court of the other State no longer has continuing, exclusive jurisdiction of the child support order because that State no longer is the child's State or the residence of any individual contestant; or

(B) each individual contestant has filed written consent with the State of continuing, exclusive jurisdiction for a court of another State to modify the order and assume continuing, exclusive jurisdiction over the order.

**(f) Recognition of child support orders.**—If 1 or more child support orders have been issued with regard to an obligor and a child, a court shall apply the following rules in determining which order to recognize for purposes of continuing, exclusive jurisdiction and enforcement:

(1) If only 1 court has issued a child support order, the order of that court must be recognized . . . .

\* \* \*

**(h) Choice of law.**

(1) In general. In a proceeding to establish, modify, or enforce a child support order, the forum State's law shall apply except as provided in paragraphs (2) and (3). . . .

**(i) Registration of modification.** If there is no individual contestant or child residing in the issuing State, the party or support enforcement agency seeking to modify, or to modify and enforce, a child support order issued in another State shall register that order in a State with jurisdiction over the nonmovant for the purpose of modification.

(Emphasis added).

Pursuant to F.L. § 10–346, appellee moved to vacate the registration. He argued, *inter alia*, that California lacked personal jurisdiction; he was not afforded an opportunity to be heard; and he had a defense under the laws of Maryland,

because he is entitled to a paternity test under F.L. § 5–1038 and the case of *Tyrone W. v. Danielle R.,* 129 Md.App. 260, 741 A.2d 553 (1999), *aff'd, Langston v. Riffe,* 359 Md. 396, 754 A.2d 389 (2000). Under F.L. § 10–301(q), F.L. § 301(r), and F.L. § 10–302, the Circuit Court for Carroll County was the "responding tribunal." F.L. § 10–315 provides that "a responding tribunal of this State: 1) shall apply the procedural and substantive law ... generally applicable to similar proceedings originating in this State...."

F.L. § 10–343 is relevant. It states:

§ **10–343. Choice of law.**

(a) *Law of issuing state.*—The law of the issuing state governs the nature, extent, amount, and duration of current payments and other obligations of support and the payment of arrearages under the order.

(b) *Statute of limitations.*—In a proceeding for arrearages, the statute of limitation under the laws of this State or of the issuing State, whichever is longer, applies.

In addition, § 10–345(a) is pertinent. It provides:

§ **10–345. Procedure to contest validity or enforcement of registered order.**

(a) *Nonregistering party may contest.*—A nonregistering party seeking to contest the validity or enforcement of a registered order in this State shall request a hearing within 20 days after the date of mailing or personal service of notice of the registration. The nonregistering party may seek to vacate the registration, to assert any defense to an allegation of noncompliance with the registered order, or to contest the remedies being sought or the amount of any alleged arrearages pursuant to § 10–346 of this subtitle (Contest of registration or enforcement).

Appellee relied, in part, on F.L. § 10–346, which states:

§ **10–346. Contest of registration or enforcement**

(a) *Defenses.*—A party contesting the validity or enforcement of a registered order or seeking to vacate the registra-

tion has the burden of proving one or more of the following defenses:

(1) the issuing tribunal lacked personal jurisdiction over the contesting party;

(2) the order was obtained by fraud;

(3) the order has been vacated, suspended, or modified by a later order;

(4) the issuing tribunal has stayed the order pending appeal;

(5) *there is a defense under the law of this State to the remedy sought;*

(6) full or partial payment has been made; or

(7) the statute of limitation under § 10–343 of this subtitle (Choice of law) precludes enforcement of some or all of the arrearages.

(b) *Remedies when defense established.*—If a party presents evidence establishing a full or partial defense under subsection (a) of this section, a tribunal may stay enforcement of the registered order, continue the proceeding to permit production of additional relevant evidence, and issue other appropriate orders. An uncontested portion of the registered order may be enforced by all remedies available under the law of this State.

(c) *Failure to establish defense.*—If the contesting party does not establish a defense under subsection (a) of this section to the validity or enforcement of the order, the registering tribunal shall issue an order confirming the order.

(Emphasis added).

In light of the 1991 Paternity Judgment, appellant relies, in part, on F.L. § 10–327. It provides:

### § 10–327. Nonparentage as defense.

A party whose parentage of a child has been previously determined by or pursuant to law may not plead nonparentage as a defense to a proceeding under this subtitle.

Title Five, Subtitle 10 of the Family Law Article pertains to paternity proceedings. F.L. § 10–354 provides:

### F.L. § 10–354. Proceeding to determine parentage.

(a) *In general.*—A tribunal of this State may serve as an initiating or responding tribunal in a proceeding brought under this subtitle or a law or procedure substantially similar to this subtitle, the Uniform Reciprocal Enforcement of Support Act, or the Revised Uniform Reciprocal Enforcement of Support Act to determine that the plaintiff is a parent of a particular child or to determine that a defendant is a parent of that child.

(b) *Applicable laws and rules.*—In a proceeding to determine parentage, a responding tribunal of this State shall apply the procedural and substantive law of this State and the rules of this State on choice of law.

Blood or genetic tests in paternity proceedings are governed by F.L. § 5–1029. It states, in pertinent part:

(b) *In general.*—On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child.

F.L. § 5–1037 is also noteworthy. It reads:

### § 5–1037. Notice.

The court may not enter an order under this subtitle against a party unless the party is given reasonable notice and an opportunity to be heard.

F.L. § 5–1038 is also relevant. It states:

### § 5–1038. Finality; modification

(a) *Declaration of paternity final; modifications.*—

(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

(2) (i) A declaration of paternity may be modified or set aside:

1. in the manner and to the extent that any order or decree of any equity court is subject to the revisory power

of the court under any law, rule, or established principle of practice and procedure in equity; or

2. if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interest of the child.

■ With these legislative enactments in mind, we turn to consider Article IV, § 1 of the United States Constitution. It provides, in part: "Full faith and credit shall be given in each State to the public acts, records, and judicial proceedings of every other State." *See also* 28 U.S.C. § 1738 (2003) ("[J]udicial proceedings ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken."). To comply with this constitutional directive, " 'the judgment of a state court should have the same credit, validity, and effect, in every other court of the United States, which it had in the state where it was pronounced.' " *Underwriters Nat'l. Assurance Co. v. North Carolina Life and Accident and Health Ins. Guaranty Assoc.*, 455 U.S. 691, 704, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982) (citation omitted).

■ Accordingly, "[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land." *Baker v. General Motors Corp.*, 522 U.S. 222, 233, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998); *see also Estin v. Estin*, 334 U.S. 541, 546, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948); *Weinberg v. Johns–Manville Sales Corp.*, 299 Md. 225, 234, 473 A.2d 22 (1984) (" 'The object of [the Full

Faith and Credit Clause is] to give to such judgments, full faith and credit; ... to attribute to them, positive and absolute verity, so that they cannot be contradicted, or the truth of them denied, any more than in the State where they originated.' ") (citation omitted); *Rentals Unlimited, Inc. v. Administrator, Motor Vehicle Administration,* 286 Md. 104, 111, 405 A.2d 744 (1979); *Miles v. Stovall,* 132 Md.App. 71, 78, 750 A.2d 729 (2000)("The purpose of the Full Faith and Credit Clause is to promote uniformity among states.").

In *Sherrer v. Sherrer,* 334 U.S. 343, 355, 68 S.Ct. 1087, 92 L.Ed. 1429 (1948), the Supreme Court elucidated the concept, stating: "The full faith and credit clause is one of the provisions incorporated into the Constitution by its framers for the purpose of transforming an aggregation of independent, sovereign States into a nation." And, as the Supreme Court said in *Milwaukee County v. M.E. White Co.,* 296 U.S. 268, 277, 56 S.Ct. 229, 80 L.Ed. 220 (1935), the clause served to alter

the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and ... make[s] them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin.

Similarly, in *Magnolia Petroleum Co. v. Hunt,* 320 U.S. 430, 439–40, 64 S.Ct. 208, 88 L.Ed. 149 (1943), the Supreme Court explained:

[T]he clear purpose of the full faith and credit clause [is] to establish throughout the federal system the salutary principle of the common law that a litigation once pursued to judgment shall be as conclusive of the rights of the parties in every other court as in that where the judgment was rendered, so that a cause of action merged in a judgment in one state is likewise merged in every other ... Because there is full faith and credit clause a defendant may not a second time challenge the validity of the plaintiff's right which has ripened into a judgment and a plaintiff may

not for his single cause of action secure a second or a greater recovery.

 Nevertheless, there are limitations on the principles of full faith and credit, consistent with "the basic structure of our Nation as a union of States...." *Imperial Hotel, Inc. v. Bell Atlantic Tri–Con Leasing Corp.*, 91 Md.App. 266, 270, 603 A.2d 1371 (1992). "Chief among these limitations is the caveat ... that a 'judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment.'" *Underwriters*, 455 U.S. at 704, 102 S.Ct. 1357 (citation omitted).

 Of significance here, in order to obtain full faith and credit, the proceedings of another state must satisfy "the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 481, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); see *Matsushita Elec. Industrial Co. v. Epstein*, 516 U.S. 367, 373, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). In *Durfee v. Duke*, 375 U.S. 106, 111, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963), the Supreme Court addressed the limits on one state's power to enforce a judgment obtained in another state, stating:

> [W]hile it is established that a court in one State, when asked to give effect to the judgment of a court in another State, may constitutionally inquire into the foreign court's jurisdiction to render that judgment, the modern decisions of this Court have carefully delineated the permissible scope of such inquiry. From these decisions there emerges the general rule that a judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment.

 Maryland has long recognized that valid judgments of another state concerning domestic matters are generally entitled to full faith and credit in this State. *See, e.g., Rethorst v. Rethorst*, 214 Md. 1, 13, 133 A.2d 101 (1957) (" 'An award of

custody, like any other judgment or decree of a competent court, is entitled to recognition and enforcement in other states.' ") (citation omitted); *McKay v. Paulson,* 211 Md. 90, 95, 126 A.2d 296 (1956) (stating that a foreign divorce decree " 'must be presumed to be valid and given full faith and credit' " " 'until it is declared to be invalid by a competent court.' ") (citation omitted); *Miles,* 132 Md.App. at 78, 750 A.2d 729 ("A sister state's judicial findings of fact, as well as conclusions of law, must be afforded full faith and credit in Maryland, unless and until judicially impeached."); *Sami v. Sami,* 29 Md.App. 161, 176, 347 A.2d 888 (1975) ("The jurisdiction of each state is determined by its own laws, subject to the Constitution and the laws of the United States, and is no less effective because it is not exclusive."); *Schwartz v. Schwartz,* 26 Md.App. 427, 432, 338 A.2d 386 (1975)(stating that the party was barred by *res judicata* from collaterally attacking the foreign judgment and that the foreign judgment was entitled to full faith and credit), *cert. denied,* 423 U.S. 1088, 96 S.Ct. 880, 47 L.Ed.2d 98 (1976).

Moreover, numerous jurisdictions have recognized that a valid, final judgment under FFCCSOA or UIFSA is entitled to full faith and credit in another state. *See, e.g., Wall v. Stinson,* 983 P.2d 736, 741 (Alaska 1999)("A valid final judgment in one state is ordinarily entitled to full faith and credit in its sister states. The FFCCSOA expressly requires that a child support order be enforced if it complies with the FFCCSOA's requirements."); *In re Marriage of Yuro,* 192 Ariz. 568, 968 P.2d 1053, 1057 (1998) (noting that, under FFCCSOA, "when two or more child support orders have been issued with respect to an obligor and child, a court must recognize the order from the court with continuing, exclusive jurisdiction"); *In re Marriage of Comer,* 14 Cal.4th 504, 59 Cal.Rptr.2d 155, 927 P.2d 265, 282 (1996)(recognizing that the purpose of the FFCCSOA is to create uniformity among states in enforcing child support orders); *Linn v. Delaware Child Support Enforcement,* 736 A.2d 954, 970 (Del.1999)(stating that a foreign arrearage order is a final judgment, entitled to full faith and credit); *Desai v. Fore,* 711 A.2d 822, 825

(D.C.1998)(noting that the FFCCSOA promotes uniformity, prevents conflicting orders, and insures against substantial hardship for children); *Dep't of Revenue ex rel. Cascella v. Cascella,* 751 So.2d 1273, 1277 (Fla.Ct.App.2000)("Like the UIFSA, [the FFCCSOA] provides that a state court must recognize and enforce the child support decree of another state if that state remains the state of the child's residence, or that of any individual contestant...."); *Early v. Early,* 269 Ga. 415, 499 S.E.2d 329, 330 (1998)("Applying these principles to the FFCCSOA, we find the statutory language is plain and unambiguous in its requirement that the court of the state that last made a child support order consistent with the FFCCSOA has continuing, exclusive jurisdiction...."); *Wilson County ex rel. Egbert v. Egbert,* 153 N.C.App. 283, 569 S.E.2d 727, 729 (2002)("In accordance with the Supremacy Clause of the United States Constitution, FFCCSOA mandates this Court to recognize the North Carolina order as the controlling law in this case."); *Emig v. Massau,* 140 Ohio App.3d 119, 746 N.E.2d 707, 710 (2000)("The FFCCSOA requires states to grant equal full faith and credit to such modifiable support orders issued by foreign states."); *Morrissey v. Morrissey,* 552 Pa. 81, 713 A.2d 614, 616 (1998)(noting that a properly registered foreign support order is treated in the same manner as "one issued by a court of this Commonwealth.").

As we noted, appellee challenged the validity of both California judgments on the ground, *inter alia,* that he was deprived of an opportunity to be heard. Writing for this Court in *Imperial Hotel,* 91 Md.App. at 270, 603 A.2d 1371, Judge Harrell said: "In a suit to enforce the judgment of another state the jurisdiction of the foreign court [which rendered it] is open to judicial inquiry." *See Adam v. Saenger,* 303 U.S. 59, 62, 58 S.Ct. 454, 82 L.Ed. 649 (1938) (same); *Renwick v. Renwick,* 24 Md.App. 277, 287, 330 A.2d 488 (1975)("[I]n a suit to enforce a foreign judgment, the jurisdiction of the court which rendered it is open to judicial inquiry ... If the rendering court acted without jurisdiction, the full faith and credit clause does not operate and the foreign

judgment is of no force or effect."). *Cf.* Maryland Code (2002 Repl.Vol.), § 11–801 et. seq. of the Courts and Judicial Proceedings Article (the "Uniform Enforcement of Foreign Judgments Act") (defining in C.J. § 11–801 that a "foreign judgment" is "a judgment, decree, or order of a court of the United States or any other court that is entitled to full faith and credit in this State"); Rule 2–623 (pertaining, *inter alia,* to the recording of foreign judgments that are "entitled to full faith and credit in this State").

This Court recognized in *Imperial Hotel* that, "before one state court is bound by a judgment rendered by a court in another state, it may inquire into the propriety of a foreign court's exercise of jurisdiction. If the foreign court did not have jurisdiction, full faith and credit need not be given." 91 Md.App. at 270–71, 603 A.2d 1371. *See also Dixon v. Keeneland Associates, Inc.,* 91 Md.App. 308, 313, 604 A.2d 502, *cert. denied,* 327 Md. 625, 612 A.2d 256 (1992). Therefore, "[t]he courts of this State are not bound ... by determinations of jurisdiction made by the courts of other states. Rather, they may make their own independent examination." *Imperial Hotel,* 91 Md.App. at 272, 603 A.2d 1371. As the Court underscored in *Imperial Hotel,* "[t]he power of the state of Maryland to examine into whether, under [foreign] law, the court of that state which rendered the judgment had authority to do so, is beyond question." 91 Md.App. at 270–71, 603 A.2d 1371. *See also Staley v. Staley,* 251 Md. 701, 705, 248 A.2d 655 (1968) ("The courts of Maryland are not bound by an unfounded recital of a jurisdictional fact ... found in the record of a court of another state and may make their own independent examination.").

On the other hand, "the full faith and credit clause of the Constitution precludes a party from attacking a decree on jurisdictional grounds in the courts of a sister state where the party participated in the original proceedings, was accorded full opportunity to context the jurisdictional issues, and where the decree was not susceptible to a jurisdictional attack in the courts of the rendering state." *Dixon,* 91 Md.App. at 313, 604

A.2d 502. We pointed out in *Dixon, id.* at 314, 604 A.2d 502, that, "[a]s the Supreme Court has previously held, the doctrine of *res judicata* must be applied to questions of jurisdiction in cases arising in state courts involving the application of the full faith and credit clause where, under the law of the state in which the original judgment was rendered, such adjudications are not susceptible to collateral attack." *See also Sherrer,* 334 U.S. at 351–52, 68 S.Ct. 1087; *Jessica G. v. Hector M.,* 337 Md. 388, 404, 653 A.2d 922 (1995) ("under the Maryland law of conflict of laws, the *res judicata* effect to be given to the judgment of a court of a foreign state is the *res judicata* effect that that judgment has in the state where the judgment was rendered."); *Rourke v. Amchem Products, Inc.,* 153 Md.App. 91, 835 A.2d 193 (2003) (same).

In this case, appellee never litigated in California the issue of whether the California courts had jurisdiction or otherwise properly entered default judgments against appellee in 1991 and 1998. Therefore, there is no *res judicata* issue here. *See Imperial Hotel,* 91 Md.App. at 272 n. 1, 603 A.2d 1371. Accordingly, the circuit court was clearly entitled to determine whether California properly exercised its jurisdiction.

As the Court explained in *Imperial Hotel,* there is a "two-step process" involved in determining whether the foreign court properly exercised jurisdiction. 91 Md.App. at 273, 603 A.2d 1371. First, "the trial court must determine whether the [foreign state] purports to authorize the assertion of personal jurisdiction . . . to the full limits allowed by constitutional due process." *Id.* Second, the Maryland court must determine "whether the exercise of jurisdiction permitted by the [foreign] statute violates the due process clause of the fourteenth amendment." *Id.* at 274, 603 A.2d 1371.

Relying upon California's long arm statute, appellant asserts:

Having engaged in conduct in California that may have resulted in the conception of a child, Mr. Ricketts had sufficient contacts with that state to be within reach of

California's long arm jurisdiction. Having been served in Maryland, he had sufficient notice of the action against him. Those facts, coupled with the presumptively valid judgment filed in the circuit court, proved conclusively that California had jurisdiction. The circuit court erred by concluding otherwise.

We are satisfied that the first prong of the two-step process was satisfied here; California acquired *in personam* jurisdiction over appellee pursuant to its long arm statute. Appellee allegedly had sufficient minimal contacts with California so that the exercise of jurisdiction under its long arm statute would not offend " 'traditional notions of fair play and substantial justice.' " *See International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted); *Christian Book Distributors, Inc. v. Great Christian Books, Inc.*, 137 Md.App. 367, 374, 768 A.2d 719 (2001).

 California's long arm statute provides: "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." CAL.CIV.PROC.CODE § 410.10 (2003). This provision "manifests an intent to exercise the broadest possible jurisdiction limited only by constitutional considerations." *County of Humboldt v. Harris*, 206 Cal.App.3d 857, 254 Cal.Rptr. 49, 51 (1988). Moreover, "the state's jurisdiction is likely to be upheld when it is based upon a particular statute or regulation and/or when the isolated act has injurious consequences in the state." *Id.*

California's UIFSA statute is codified at CAL. FAM.CODE §§ 4900 to 5005. With regard to jurisdiction over nonresidents, CAL. FAM.CODE § 4905 provides:

In a proceeding to establish, enforce, or modify a support order or to determine parentage, a tribunal of this state may exercise personal jurisdiction over a nonresident individual or the individual's guardian or conservator if any of the following apply:

(1) The individual is personally served with notice within this state.

(2) The individual submits to the jurisdiction of this state by consent, by entering a general appearance, or by filing a responsive document having the effect of waiving any contest to personal jurisdiction.

(3) The individual resided with the child in this state.

(4) The individual resided in this state and provided prenatal expenses or support for the child.

(5) The child resides in this state as a result of acts or directives of the individual.

(6) *The individual engaged in sexual intercourse in this state and the child may have been conceived by that act of intercourse.*

(7) The individual has filed a declaration of paternity pursuant to Chapter 3 (commencing with Section 7570) of Part 2 of Division 12.

(8) There is any other basis consistent with the constitutions of this state and the United States for the exercise of personal jurisdiction.

(Emphasis added).[13]

As to the determination of jurisdiction, California has said:

[I]n determining whether to give full faith and credit to a sister state judgment ... the permissible scope of inquiry is limited to whether the court had jurisdiction over the subject matter and the relevant parties, often referred to as "fundamental jurisdiction." Further, even as to jurisdiction, the judgment may be challenged only if the issue of jurisdiction was not litigated in the foreign state. If, rather, "the court of the first state has expressly litigated the question of jurisdiction, its determination is res judicata and is itself protected by the full faith and credit clause."

---

**13.** We note that Maryland law is to the same effect. F.L. § 10–304(5) provides: "In a proceeding to establish, enforce, or modify a support order or to determine parentage, a tribunal of this State may exercise personal jurisdiction over a nonresident if: ... the child may have been conceived in this State...."

*Bank of America National Trust v. Jennett,* 77 Cal.App.4th 104, 91 Cal.Rptr.2d 359, 365 (1999) (citations omitted).

In this case, because appellee allegedly engaged in sexual conduct in California that may have resulted in the conception of a child, he had sufficient contacts with California to meet the initial test for personal jurisdiction under California's long-arm statute. *See County of Humboldt v. Harris, supra,* 206 Cal.App.3d 857, 254 Cal.Rptr. 49 (concluding that conception and birth of a child in California constitute sufficient contacts with California to invoke personal jurisdiction under long-arm statute over non-resident putative father); *see also Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (recognizing that there is a sufficient connection to the forum state if the cause of action "arises out" of defendant's activities in the forum or the defendant had "sufficient contacts" with the forum state). Based on appellee's conduct, he reasonably should have anticipated being sued in a California court. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

The second prong of the two-step process makes clear that the exercise *in personam* jurisdiction must also satisfy the due process clause of the Fourteenth Amendment of the United States Constitution. This means that the defendant must receive reasonable notice that an action has been brought as well as an opportunity to be heard. *See Kulko v. Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla,* 357 U.S. 235, 245, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 26 (1988) ("Reasonable notice and reasonable opportunity to be heard must be given the party at each new step of the proceeding.").

Our analysis focuses on whether appellee was given a reasonable opportunity to be heard, consistent with the requirements of due process. "The due process clauses in the Fourteenth Amendment and in Article 24 of the Maryland

Declaration of Rights protect an individual's interests in substantive and procedural due process." *Knapp v. Smethurst,* 139 Md.App. 676, 703, 779 A.2d 970 (2001);[14] *see People's Counsel v. Maryland Publ. Serv. Comm'n,* 355 Md. 1, 25–27, 733 A.2d 996 (1999); *Roberts v. Total Health Care, Inc.,* 349 Md. 499, 508–09, 709 A.2d 142 (1998) (discussing procedural due process); *Pitsenberger v. Pitsenberger,* 287 Md. 20, 27, 410 A.2d 1052 (1980); *City of Annapolis v. Rowe,* 123 Md.App. 267, 275–77, 717 A.2d 976 (1998).

In general, there are four "categories" of due process actions: "(1) a procedural due process claim premised on the deprivation of a property interest; (2) a procedural due process claim premised on the deprivation of a liberty interest; (3) a substantive due process claim premised on the deprivation of a property interest; and (4) a substantive due process claim premised on the deprivation of a liberty interest." *Samuels v. Tschechtelin,* 135 Md.App. 483, 523, 763 A.2d 209 (2000).

"Procedural due process imposes constraints on governmental decisions [that] deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). "A fundamental component 'of the procedural due process right is the guarantee of an opportunity to be heard and its instrumental corollary, a promise of prior notice.'" *Knapp,* 139 Md.App. at 703, 779 A.2d 970 (quoting Lawrence Tribe, *American Constitutional Law* § 10–15, at 732 (2nd ed.1988)). As the Court of Appeals said in *Pickett v. Sears, Roebuck & Company,* 365 Md. 67, 81, 775 A.2d 1218 (2001), it "has long held that procedural due process requires that litigants must receive notice, and an opportunity to be heard." That assertion was echoed in *Roberts,* 349 Md. at 509, 709 A.2d 142, when the Court said: "At '[t]he core of due process is the right to notice and a meaningful opportuni-

---

**14.** Article 24 of the Maryland Declaration of Rights and the Due Process Clause of the Fourteenth Amendment are *in pari materia. Pickett v. Sears, Roebuck & Co.,* 365 Md. 67, 77, 775 A.2d 1218 (2001).

ty to be heard.' " (quoting *LaChance v. Erickson,* 522 U.S. 262, 266, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998)); *see Attorney Grievance Comm'n v. Fezell,* 361 Md. 234, 246, 760 A.2d 1108 (2000); *Owens v. State,* 352 Md. 663, 697, 724 A.2d 43, *cert. denied,* 527 U.S. 1012, 119 S.Ct. 2354, 144 L.Ed.2d 250 (1999); *Blue Cross of Md., Inc. v. Franklin Square Hosp.,* 277 Md. 93, 101, 352 A.2d 798 (1976); *Maryland Racing Comm'n v. Belotti,* 130 Md.App. 23, 55, 744 A.2d 558 (1999); *Gnau v. Seidel,* 25 Md.App. 16, 19–20, 332 A.2d 739 (1975).

Indeed, the cases are legion that "the fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914); *see Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)(Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Boitnott v. Mayor & City Council of Baltimore,* 356 Md. 226, 244, 738 A.2d 881 (1999)("Procedural due process ensures that citizens are afforded both notice and an opportunity to be heard, where substantive rights are at issue."); *Drolsum v. Horne,* 114 Md.App. 704, 713, 691 A.2d 742, *cert. denied,* 346 Md. 239, 695 A.2d 1227 (1997)(stating that due process is met when " 'there is at some stage an opportunity to be heard suitable to the occasion' ") (emphasis and citation omitted), *cert. denied,* 346 Md. 239, 695 A.2d 1227 (1997); *Kaplan v. Bach,* 36 Md.App. 152, 157, 373 A.2d 71 (1977)("Due process, as it relates to judicial proceedings, requires notice and opportunity to defend.").

California law is to the same effect. The case of *In re the Marriage of Lippel,* 51 Cal.3d 1160, 276 Cal.Rptr. 290, 801 P.2d 1041 (1990) is noteworthy. There, the court was asked to decide whether a father's due process rights were violated by the entry of a default judgment requiring him to pay child support. Because the wife's petition for marital dissolution did not ask for child support, the husband had no notice of such a request. The California court voided the default judgment because of the lack of notice, stating: "It is a

fundamental concept of due process that a judgment against a defendant cannot be entered unless he was given proper notice and an opportunity to defend." *Id.* at 1043. Indeed, while recognizing the state's "duty and responsibility to protect the rights of children," the California court acknowledged that "it cannot do so at the expense of a person's fundamental and constitutional right to notice." *Id.* at 1047. *See also San Bernardino Community Hospital v. Workers' Compensation Appeals Board,* 74 Cal.App.4th 928, 88 Cal.Rptr.2d 516, 522 (1999)("The essence of due process is simply notice and the opportunity to be heard."); *Rodriguez v. Department of Real Estate,* 51 Cal.App.4th 1289, 59 Cal.Rptr.2d 652, 656 (1996) (stating that "[t]he central purpose of procedural due process is to provide affected parties with the right 'to be heard at a meaningful time and in a meaningful manner.' ") (citation omitted); *Washoe Development Co. v. Guaranty Federal Bank,* 47 Cal.App.4th 1518, 55 Cal.Rptr.2d 479, 481 (1996) stating that " 'a judgment entered by one state must be recognized by another state if the state of rendition had jurisdiction over the parties and the subject matter and all interested parties were given reasonable notice and an opportunity to be heard.' " (citation omitted); *Brinker v. Superior Court,* 235 Cal.App.3d 1296, 1 Cal.Rptr.2d 358, 360 (1991) (stating that "the judgment of a sister state must be given full faith and credit if that sister state had jurisdiction over the parties and the subject matter, and all interested parties were given reasonable notice and [an] opportunity to be heard."); *Silbrico Corp. v. Raanan,* 170 Cal.App.3d 202, 216 Cal.Rptr. 201, 205 (1985)("[T]he judgment of a sister state must be recognized in a California court if that sister state had jurisdiction over the parties and the subject matter and all interested parties were given reasonable notice and opportunity to be heard."); *World Wide Imports, Inc. v. Bartel,* 145 Cal. App.3d 1006, 193 Cal.Rptr. 830, 832 (1983) (same).

To be sure, there is a "need for flexibility in the application of due process." *Pickett,* 365 Md. at 83, 775 A.2d 1218; *see Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (noting that "due process is

flexible and calls for such procedural protections as the particular situation demands."); *Wagner v. Wagner,* 109 Md.App. 1, 24, 674 A.2d 1 (stating that due process "calls for such procedural protection as a particular situation may demand."), *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996); *Rodriguez,* 59 Cal.Rptr.2d at 656 ("Due process is a flexible concept."). The extent of procedural due process afforded is influenced by the extent to which an individual may be " 'condemned to suffer grievous loss.' " *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (citation omitted). Put another way, "the concept of due process is not static—the process that is due may change according to the circumstances." *Miserandino v. Resort Prop., Inc.,* 345 Md. 43, 65, 691 A.2d 208, *cert. denied,* 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 292, and *cert. denied sub nom., Commonwealth Sec'y v. Miserandino,* 522 U.S. 963, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997); *see Department of Transportation v. Armacost,* 299 Md. 392, 416, 474 A.2d 191 (1984); *Sullivan v. Insurance Comm'r,* 291 Md. 277, 284–85, 434 A.2d 1024 (1981).

■■■ The Supreme Court has recognized that the requirements of procedural due process depend upon the particular factual circumstances. *See Hannah v. Larche,* 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). It has identified "three distinct factors" to be evaluated in determining what process is constitutionally due. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. There are: 1) the private interests at stake that will be affected by the disputed "official action"; 2) "the risk" that the procedures used will lead to an "erroneous deprivation of such interest"; and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.; see Goldberg v. Kelly,* 397 U.S. at 263, 90 S.Ct. 1011; *Rodriguez,* 59 Cal.Rptr.2d at 656.

■■■ In *Pickett,* 365 Md. at 78, 775 A.2d 1218, the Court of Appeals explained that, "[i]n order to properly challenge state action as a violation of procedural due process, the party challenging the action must show that the state acted to

deprive the complainant of a property interest encompassed by the language of the due process clause." (citing *Fuentes v. Shevin,* 407 U.S. 67, 84, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)). If the court determines that "State action deprived an individual of a protected property interest, the Court must balance the interests of all parties to the matter in order to determine the level of procedural due process which is constitutionally required under the circumstances." *Id.; see Tulsa Prof'l. Collection Services, Inc. v. Pope,* 485 U.S. 478, 484, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988).

Therefore, to succeed in an action alleging a denial of procedural due process, in violation of a property interest, "a plaintiff must demonstrate that he had a protected property interest, that he was deprived of that interest [by the state], and that he was afforded less procedure than was due." *Samuels,* 135 Md.App. at 523, 763 A.2d 209; *see Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–41, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Roberts,* 349 Md. at 510, 709 A.2d 142; *Golden Sands Club Condominium, Inc. v. Waller,* 313 Md. 484, 488 n. 4, 545 A.2d 1332 (1988); *Rowe,* 123 Md.App. at 275–76, 717 A.2d 976; *Regan v. Board of Chiropractic Examiners,* 120 Md.App. 494, 510, 707 A.2d 891 (1998), *aff'd,* 355 Md. 397, 735 A.2d 991 (1999). Significantly, "there is no requirement that actual prejudice be shown before denial of due process can be established." *Wagner,* 109 Md.App. at 24, 674 A.2d 1; *see Town of Somerset v. Montgomery County Bd. of Appeals,* 245 Md. 52, 66, 225 A.2d 294 (1966).

In a paternity proceeding, it would seem that at least one "primary interest of [a putative father] is in avoiding the serious economic consequences that flow from a court order that establishes paternity and its correlative obligation to provide support for the child." *Rivera v. Minnich,* 483 U.S. 574, 580, 107 S.Ct. 3001, 97 L.Ed.2d 473 (1987). Clearly, in a proceeding to determine child support, "the private interest at stake is financial." *County of Yuba v. Savedra, supra,* 93 Cal.Rptr.2d at 533; *see also Moss v. Superior Court,* 17 Cal.4th 396, 71 Cal.Rptr.2d 215, 950 P.2d 59, 67

(1998)(recognizing that the obligation to support one's children is "among the most fundamental obligations recognized by modern society"); *Clark v. Superior Court*, 62 Cal.App.4th 576, 73 Cal.Rptr.2d 53, 57 (1998)("The only legitimate interest ... is in paying the minimum lawfully appropriate [child support] amount."). "The government's interest, on the other hand, is in making certain that those parents who are able to support their children do so, thus freeing the government from shouldering that burden." *County of Yuba*, 93 Cal. Rptr.2d at 533–34. And, a state "admittedly has a legitimate interest in the welfare of a child born out of wedlock who is receiving public assistance, as well as in securing support for the child from those legally responsible." *Little v. Streater*, 452 U.S. 1, 14, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981).

 Certainly, the private interests at stake are considerable in both paternity and child support proceedings. The procedure that is due to a putative father ought to ensure that those interests are adequately protected by measures that minimize an erroneous declaration of paternity, with all of its emotional consequences, and the corresponding burden of financial support for the child until the age of majority. That did not happen in California.

We need not repeat the factual summary that we previously set forth. Indeed, appellant's attorney conceded below that appellee's "recitation" of the facts "is pretty accurate. This is really just a question of statutory construction. We really don't disagree too much about the underlying facts." Therefore, we shall only highlight a few of the facts that undergird our conclusion.

Both the District Attorney and the California court were aware of appellee's position as early as 1991. On May 29, 1991, some eighteen days after appellee was initially served with the California paternity complaint, appellee made his first attempt to contest the proceedings, by filing a motion to dismiss. It is undisputed that appellee's response to the 1991 paternity suit was timely. Nevertheless, the Clerk of the court returned appellant's motion because it was not verified.

However, the instructions that appellee received from the court with the complaint did not direct him to file a verified response. Nor has appellant shown that appellee was actually required under California law to file a verified motion.

At the same time, the Clerk advised appellee that the District Attorney may enter a "Stipulation for dismissal" and that the "Motion *must* be set for hearing...." (Emphasis added). In our view, those comments would have suggested to a reasonable person that a hearing would be scheduled, without further action required by appellee. Yet, the record does not reflect that any such hearing was either scheduled or held.

When the Clerk returned the original motion to dismiss, the Clerk also wrote: "Notice must be *served* on DA." (Emphasis added). In our view, a reasonable person could have understood that comment as a directive to re-file the motion with the District Attorney. Indeed, that is exactly how appellee's lawyer *at that time* interpreted the instruction; he sent the verified motion to the District Attorney. As appellee's new lawyer observed at the exceptions hearing on October 3, 2001, appellee's prior lawyer merely followed the instructions of the Clerk's Office when, in 1991, he sent the motion to the District Attorney. Appellee's lawyer explained that the Clerk's letter told appellee to "certify it to the District Attorney's Office, and that's what he did."

Subsequently, without the benefit of a hearing or a ruling on appellee's motion to dismiss the paternity case, the California court entered a Paternity Judgment in 1991, by default, declaring appellee the father of an unborn child. The master and the circuit court agreed with appellee that California consistently failed to provide appellee with an "opportunity to appear and defend." As we see it, those findings are not clearly erroneous.

With respect to appellant's claim that the second motion was untimely filed, it is hard to fault appellee for that circumstance. Appellee was served with the suit on May 11, 1991. However, the the Clerk did not return appellee's original

motion until on or about June 10, 1991. By that point, thirty days had elapsed. Thus, by the time the first motion was returned, it was already too late for appellee to re-file it within thirty days of service.

Thereafter, the California court entered a Paternity Judgment against appellee, by default. Six years elapsed before appellee heard again from California. On December 19, 1997, the California court served appellee with the child support suit. The California court informed appellee that he had the right to a hearing, to contest the paternity of the child, and the right to a blood test. The notice stated: "If you file an Answer, you have a right to a court hearing, to ask questions of any witness against you, to subpoena witnesses, and to present evidence on your behalf." Appellee was also informed: "If you deny that you are the parent of the children, you may be scheduled for parentage blood tests." The California court also warned appellee: "You may contact the district attorney to try and work out an agreement. However, you must still file an answer within 30 days." (Emphasis added).

Through a letter sent by appellant's attorney to the Stanislaus County District Attorney on January 8, 1998, appellee requested a DNA test to determine paternity. When he did not receive a response, appellee personally wrote to the District Attorney. Moreover, appellee subsequently completed at least part of the three page Answer form, indicating that the he was not the father of the child. He wrote: "I would like proof of parentage of this child before I send additional personal information." In addition, appellee said: "I am willing to send more income information if parentage can be proven. I am requesting *no* information on my address, income etc. be given to the child's mother." Appellee also submitted the requested financial information.

On April 30, 1998, the District Attorney filed an amended complaint, revising the amount of arrearages. Appellee did not submit a new answer, apparently because only the amount of arrearages had changed. However, in June 1998 appellee

submitted an application for a waiver of court fees. He did not receive a response. Yet, a default judgment regarding parental support obligations was entered against appellee on September 1, 1998, for more than $10,000 in child support arrears. It is that judgment which California now seeks to enforce in Maryland.

Appellant insists that the 1991 Paternity Judgment has nothing to do with the 1998 Child Support Judgment, and contends that it would be erroneous for us to consider the Paternity Judgment in any analysis as to the validity of the Child Support Judgment. Appellant relies on F.L. § 10–327 to support its claim that paternity is not a defense to a UIFSA action. As we noted, F.L. § 10–327 provides that a "party whose parentage ... has been previously determined by or *pursuant to law* may not plead nonparentage as a defense...." (Emphasis added). *See Reid v. Dixon,* 136 N.C.App. 438, 524 S.E.2d 576 (2000) ("Under North Carolina's enactment of [UIFSA], a party whose parentage of a child has been previously determined under law may not plead parentage as a defense in a proceeding to enforce the payment of child support."). Appellant also points out that the Legislature "did not revise" F.L. § 10–346, "setting out the allowable defenses to registration and enforcement of another state's child support order under UIFSA." Therefore, appellant contends that, based on the application of F.L. § 10–327 and F.L. § 10–346, "[p]arentage is not a permissible basis for refusing to register and enforce a foreign child support order," and the circuit court had no authority in this UIFSA case to order paternity testing.

We see it differently. In the context of this case, the 1991 and 1998 judgments are inextricably intertwined. Without question, the 1991 Paternity Judgment spawned the 1998 Child Support Judgment. Moreover, F.L. § 10–327 does not preclude appellee's challenge. Indeed, appellant overlooks a key phrase in the text of that provision: parentage must have been previously determined "pursuant to law." Appellee has consistently maintained that the 1991 Paternity Judgment was not valid, because he repeatedly sought to challenge paternity,

but the California court ignored his efforts; therefore, appellee was not afforded the opportunity to be heard. If appellee was, indeed, denied an opportunity to be heard, as due process requires, it follows that paternity was not established "pursuant to law," and appellant cannot then rely on F.L. § 10–327.

■ In the UIFSA proceeding to enforce the 1998 Judgment, appellee had the statutory right to contest the validity or enforcement of a registered order under F.L. § 10–345(a)("The nonregistering party may seek to vacate the registration, to assert any defense to an allegation of noncompliance with the registered order, or to contest the remedies being sought or the amount of any alleged arrearages pursuant to F.L. § 10–346 of this subtitle . . ."). The statute allows appellee, the party contesting enforcement of the registered order, to assert one or more of seven enumerated defenses. F.L. § 10–346. Appellee was entitled to contest the foreign judgment on the basis of a lack of personal jurisdiction, fraud, and "a defense under the law of this State to the remedy sought." F.L. § 10–346(a). As this Court said in *Osteoimplant Technology, Inc. v. Rathe Productions, Inc.*, 107 Md. App. 114, 666 A.2d 1310 (1995), " 'After a foreign judgment has been duly filed, the grounds for reopening or vacating it are limited to lack of personal or subject matter jurisdiction of the rendering court, fraud in procurement (extrinsic), satisfaction, *lack of due process,* or other grounds that make the judgment invalid or unenforceable.' " *Id.* at 119–20, 666 A.2d 1310 (citing *Matson v. Matson,* 333 N.W.2d 862, 867 (Minn.1983))(emphasis added), *cert. denied,* 341 Md. 648, 672 A.2d 623 (1996).

Before full faith and credit can be given to a judgment of the California court under UIFSA, the circuit court must be satisfied that appellee was accorded due process. See 28 U.S.C. § 1738B(c)(2)("A child support order made by a court of a State is made consistently with this section if . . . reasonable notice and opportunity to be heard is given to the contestants."). We perceive no error in the circuit court's finding that appellee was "deprived" of "his opportunity to

appear and defend." Because appellee was not afforded due process in connection with either the 1991 Paternity Judgment or the 1998 Child Support Judgment, the court below properly declined to accord full faith and credit to either judgment.

In light of our conclusion, we need not resolve appellant's claim that "the circuit court's reliance on *Tyrone W.* and *Langston* is misplaced." *See Tyrone W. v. Danielle R.,* 129 Md.App. 260, 278–79, 741 A.2d 553 (1999), *aff'd. sub nom, Langston v. Riffe,* 359 Md. 396, 412–13, 754 A.2d 389 (2000); *see also Walter v. Gunter,* 367 Md. 386, 788 A.2d 609 (2002). F.L. § 5–1038 and F.L. § 5–1029 (generally permitting a declaration of paternity entered by a Maryland court to be set aside " '. . . if a blood or genetic test . . . establishes the exclusion of the individual' " as the father). Our decision, however, does not preclude further litigation in the appropriate forum to establish paternity and child support pursuant to the law.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**